UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------X
FLORENCIA PENA O/B/O E.R.,                    **NOT FOR PRINT OR**
                                              **ELECTRONIC PUBLICATION**

                    Plaintiff,                **MEMORANDUM & ORDER**
                                              11-CV-1787(KAM)
          - against -

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                    Defendant.
-----------------------------------X
**MATSUMOTO, United States District Judge:**

          Pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3),

plaintiff Florencia Pena("plaintiff"), on behalf of her minor

son, E.R., appeals the final decision of defendant Commissioner

of Social Security Michael Astrue (the "Commissioner") that E.R.

was not eligible for Supplemental Security Income ("SSI")

benefits pursuant to Title XVI of the Social Security Act (the

"Act").  Plaintiff argues that she is entitled to receive SSI

benefits on behalf of E.R. because the Commissioner's decision

was not supported by substantial evidence and is "tainted by

failure to apply the correct legal standards." (*See* ECF No. 1,

Complaint ¶ 14 ("Compl.").)  Presently before the court are the

parties' cross-motions for judgment on the pleadings.  For the

reasons set forth below, the Commissioner's motion for judgment

on the pleadings is granted and plaintiff's cross-motion for

judgment on the pleadings is denied.

I.    **Social Security Disability Determination Process**

Under the Act, "[e]very aged, blind, or disabled individual who is determined . . . to be eligible on the basis of his income and resources shall, in accordance with and subject to the provisions of this subchapter, be paid benefits by the Commissioner of Social Security."  42 U.S.C. § 1381a.  An individual under the age of eighteen is considered disabled under the Act if he has "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id.* § 1382c(a)(3)(C)(i); *Kittles ex rel. Lawton v. Barnhart*, 245 F. Supp. 2d 479, 487 (E.D.N.Y. 2003).  However, an individual under the age of eighteen who "engages in substantial gainful activity" is not eligible for SSI benefits.  42 U.S.C. § 1382c(a)(3)(C)(ii); *Kittles*, 245 F.Supp.2d at 488; 20 C.F.R. § 416.924(b).

In order for a claimant under the age of eighteen to be found disabled, the Act requires an administrative law judge to conduct a three-step sequential analysis finding each of the following: (1) that the claimant is not engaged in substantial gainful activity; (2) that the claimant has a medically determinable impairment or a combination of impairments that is

"severe" (i.e., the impairment or combination of impairments cause more than a minimal functional limitation); and (3) that the impairment or combination of impairments meet or equal a disabling condition identified in the listing of impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1 (a "listed impairment"). *See Jones ex rel. T.J. v. Astrue*, No. 07-CV-4886, 2010 WL 1049283, at *5 (E.D.N.Y. Mar. 17, 2010); *Kittles*, 245 F. Supp. 2d at 488; 20 C.F.R. § 416.924(b)-(d). Equivalence to a listed impairment may be medical or functional. *See Jones ex rel. T.J.*, 2010 WL 1049283, at *5; *Kittles*, 245 F.Supp.2d at 488; 20 C.F.R. § 416.924(d).

Analysis of functional equivalence requires the ALJ to assess the claimant's functional ability in six main areas referred to as "domains." 20 C.F.R. § 416.926a(b)(1). The domains are "broad areas of functioning intended to capture all of what a child can or cannot do." *Id.* Those domains include: "(i) [a]quiring and using information; (ii) [a]ttending and completing tasks; (iii) [i]nteracting and relating with others; (iv) [m]oving about and manipulating objects; (v) [c]aring for [oneself]; and (vi) health and physical well-being." *Id.* Functional equivalence is established when the ALJ finds that the claimant has a "marked limitation" in two domains or an "extreme limitation" in one domain. 20 C.F.R. § 416.926a(a). "Marked limitation" is described as an impairment that seriously

interferes with a claimant's ability to "independently initiate, sustain and complete activities." *Id.* § 416.926a(e)(2). It is "more than moderate, but less than extreme." *Id.* In addition, "marked limitation" is also described as what would be expected with the equivalent of two standard deviations below the mean on standardized testing. *Id.* § 416.926a(e)(2)(iii). "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with the ability to function (based upon age-appropriate expectations) independently, appropriately, effectively, and on a sustained basis." *Jones*, 2010 WL 1049283, at *6 (quoting 20 C.F.R. Pt. 404, Subpart P, App. 1, § 112.00(C)).

## II. Procedural History

Plaintiff filed an application for SSI benefits on behalf of E.R. on January 24, 2008, claiming that E.R. was disabled since January 1, 2003. (*See* ECF No. 19, Administrative Transcript ("Tr.") at 93.) Plaintiff's application was administratively denied, and she thereafter requested an administrative hearing. (*See* Tr. 53-56, 58-60.) Plaintiff and her non-attorney representative appeared before Administrative Law Judge Seymour Fier (the "ALJ") on August 25, 2009. (*See* Tr. 28-51.) On October 9, 2009, the ALJ issued a decision concluding that E.R. was not disabled within the definition of

the Act. (Tr. 8-27.) On November 21, 2009, Plaintiff sought review of the ALJ's decision by the Appeals Council. (*See* Tr. 6-7.) On February 11, 2011, the ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review. (Tr. 1-5.)

Plaintiff filed the instant appeal on April 12, 2011. (*See generally* Compl.) On November 7, 2011, plaintiff filed a motion for judgment on the pleadings. (*See* ECF No. 24, Notice of Motion for Judgment on the Pleadings; ECF No. 24, Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings ("Pl. Mem.").) The Commissioner cross moved for judgment on the pleadings on February 13, 2012. (*See* ECF No. 21, Notice of Motion for Judgment on the Pleadings; ECF No. 22, Memorandum of Law in Support of Defendant's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Judgment on the Pleadings ("Def. Mem.").) Plaintiff served the Commissioner with her reply, and the fully briefed motion was filed on March 16, 2012. (*See* ECF No. 24, Reply Memorandum of Law in Further Support of Plaintiff's Motion for Judgment on the Pleadings and in Opposition to Defendant's Cross-Motion for Judgment on the Pleadings ("Pl. Reply").) The Commissioner served plaintiff with his reply, and his fully briefed motion was filed, on May 3, 2012. (*See* ECF No. 23,

Reply Memorandum of Law in Further Support of Defendant's Cross-Motion for Judgment on the Pleadings ("Def. Reply").)

Plaintiff alleges that she is entitled to receive SSI benefits due to E.R.'s severe medically determinable impairments, including attention deficit hyperactivity disorder and severe speech and language delays, which plaintiff contends have rendered E.R. disabled since January 1, 2003. (*See* Tr. 93, 140.) Plaintiff alleges that the ALJ's decision was erroneous, contrary to law, and not supported by substantial evidence in the record. (*See* Pl. Mem. at 1.)

### III. Summary of Personal and Non-Medical History

E.R. was born on June 12, 1998. (Tr. 31). E.R. lives with his parents and has two younger brothers. (Tr. 38-39.) When he was three years old, E.R. allegedly had lead poisoning, although the record is devoid of any medical test indicating elevated blood levels. (Tr. 210.) E.R. has otherwise been in average health. (Tr. 210-13.)

At the time this appeal was filed, E.R. was 13 years old and attending a regular education class at P.S. 143. (*Id.*). E.R. has passed each grade and has never been left back. (Tr. 34). At school, E.R. has friends and plays basketball and softball. (Tr. 45.)

E.R. was diagnosed with attention deficit hyperactivity disorder ("ADHD") in 2004 and sees a psychologist,

Nelson Rivero, twice weekly, and a psychiatrist, Sherley Millet, M.D. ("Dr. Millet"), once a month. (Tr. 33.) E.R. also attends speech therapy at school twice a week with other students. (Tr. 42.) E.R. is currently prescribed Adderall XR ("Adderall"),[1] 15 milligrams per day, by Dr. Millet and has continuously taken his medication on days he goes to school. (Tr. 34, 38-39.)

According to plaintiff's hearing testimony, E.R.'s problem is his aggressive behavior. (Tr. 34-35.) Plaintiff testified that she has received numerous complaints from the school about E.R.'s behavior, including that he does not do what he is supposed to and that he bothers the other children. (Tr. 35.) Plaintiff testified that E.R. has hit other children, but has never been suspended from school. (*Id.*) In addition, plaintiff testified that the school calls her three to four times a week about E.R.'s behavioral issues. (Tr. 40.)

At home, plaintiff testified that E.R. cannot control himself, hits his brothers, and "take[s] whatever he wants." (*Id.*) E.R. does his homework alone and it takes all afternoon to finish it. (Tr. 40, 42.) In addition, E.R. has trouble sleeping at night, but plaintiff had not yet discussed this with E.R.'s psychiatrist. (Tr. 42-43.)

---

[1] Adderall, produced by Shire US, Inc., is a stimulant containing a mix amphetamine salts and is used to treat ADHD. PDR.NET, PHYSICIAN'S DESK REFERENCE 2734-39 (66th ed. 2012).

Plaintiff believes that E.R. is taking Adderall because he is not able to retain what he learns in school. (Tr. 42.) Plaintiff noted that E.R.'s grades have improved but that he still is not at the level he should be. (Tr. 40.) Thus, plaintiff testified that she thinks the medication is helping, but that E.R. is "not well yet." (Tr. 40, 42.)

## IV. Summary of Medical History

### A. 2004 Diagnosis and Treatment

Although plaintiff claims that E.R. has been disabled since January 1, 2003, the earliest medical records contained in the administrative record are from April 7, 2004, when E.R. was almost six years old. On that day, E.R. was evaluated by Dr. Millet at the Western Queens Consultation Center (the "WQCC"). (Tr. 218-19) During a mental status examination, Dr. Millet noted that E.R. had appropriate clothing, mannerisms, attitude, and awareness. (Tr. 218) E.R was alert and he showed a cooperative attitude. (*Id.*) His emotion was labile, but appropriate. (*Id.*) Dr. Millet found E.R. was anxious and that his energy level was the "[p]ervasive [e]motion that color[ed] [E.R.'s] perceptions." (*Id.*) His speech was spontaneous and his thought process was rational and coherent. (*Id.*) The examination also reported that E.R. had poor concentration, memory, insight into his condition, and judgment concerning the consequences of his behavior. (*Id.*) For example, E.R. knew his

name, age, and date of birth; however, did not know his home address, the date and time, WQCC's address, or why he was there. (*Id.*)  As a result, Dr. Millet diagnosed E.R. with ADHD and gave him a Global Assessment of Functioning ("GAF") score of 50.[2] (*Id.*)

Approximately one month later, on May 15, 2004, E.R. was re-evaluated by Dr. Millet.  (Tr. 216-17).  This examination was virtually identical to the previous mental examination, except that E.R. could recall his home address, and his affect was normal.  (Tr. 216.)  E.R. was not anxious and his mood was neutral.  E.R.'s diagnosis and GAF score remained the same. (*Id.*)  The report noted that E.R. had been exhibiting signs of restlessness, impulsivity, and low attention at school and at home.  (Tr. 217)  The report further noted that E.R. spelt poorly, made careless mistakes, was easily distracted, and had difficulty staying in his seat.  (*Id.*)  The report also noted that, in the prior two months, E.R. began to defecate on himself despite being toilet trained.  (*Id.*)  The suggested treatment was psychotherapy and medication to target E.R.'s ADHD.  (*Id.*)

---

[2] GAF is a numerical scale used by mental health professionals to subjectively rate patients' symptoms or impairments in social, occupational, or social functioning.  The GAF scale is a numerical scale from 0 to 100.  A score of 41 to 50 indicates serious symptoms or "serious impairments in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS-TEXT REVISION 32 (4th ed. 1994).

In addition to her monthly meetings,[3] Dr. Millet reviewed E.R.'s treatment plan on a quarterly basis. (*See* Tr. 273-369.) The July 7, 2004 treatment plan review noted that E.R. had improved concentration and had maintained good physical health. (Tr. 273.) E.R.'s school performance and motivation had improved, as had his communication and social skills. (*Id.*) E.R.'s functional deficits were listed as poor self-control and self-esteem. (Tr. 274.)

On July 10, 2004, E.R. was prescribed Adderall and directed to take 5 milligrams daily. (Tr. 220.) In November 2004, E.R.'s prescription was increased from 5 to 10 milligrams. (*Id.*)

On October 7, 2004, E.R.'s second treatment plan review showed continued improvement in school performance, behavior, and social skills. (Tr. 271.) E.R. was showing decreased oppositional behavior and was keeping his routine medical appointments. (*Id.*) The review also noted that E.R.'s functional deficits were anxiety, and irritability with low self-esteem. (Tr. 272.)

**B. 2005 ADHD Treatment History**

On January 7, 2005, Dr. Millet's treatment plan review noted that E.R. had decreased anxiety, irritability, and

_____

[3] The record contains Dr. Millet's treatment notes from her monthly meetings with E.R. from October 2005 through February 2008. (Tr. 225-46.)

oppositional behavior. (Tr. 269.) E.R. had improved his concentration and ability to think clearly. (*Id.*) E.R. was also in good physical health and his social life was improving. (*Id.*) Nevertheless, E.R.'s functional deficits were listed as anxiety and irritability with low self-esteem. (Tr. 270.)

On April 6, 2005, E.R. underwent another mental status examination at WQCC. (*Id.* at 214-15). E.R. improved his concentration, memory, and intellectual functioning from poor to fair. (Tr. 214). His insight improved from poor to fair and his judgment improved from poor to impaired. (*Id.*) E.R.'s speech, mood, and range of emotionality remained the same. (*Id.*) Although E.R.'s diagnosis remained the same, his GAF score increased to 60.[4]

The following day, Dr. Millet's treatment plan review noted continued improvement in E.R.'s school performance, behavior, and social skills. (Tr. 267-68.) While the report noted that E.R. had decreased his out-of-control reactions and oppositional behavior, E.R.'s functional deficits were listed as anxiety, irritability, and behavioral problems. (*Id.*)

Dr. Millet's July 7, 2005 treatment plan review noted that E.R. continued to decrease his out-of-control behavior. (Tr. 265.) Despite improved social skills and behavior, E.R.

---

[4] A GAF score of 60 indicates moderate symptoms including, "moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peer or co-workers)." AMERICAN PSYCHIATRIC ASSOCIATION, *supra* note 2, at 32.

showed poor progress in school performance.  (*Id.*)   E.R.'s

listed functional deficits were anxiety, irritability, short

attention span, and poor school performance.  (Tr. 266.)

Dr. Millet's October 7, 2005 treatment plan review

noted "significant progress" toward reaching E.R.'s mental

health objectives.[5]  (Tr. 263.)  E.R. showed marked improvement

in overcoming his hyperactivity, but was slowly progressing in

dealing with and accepting demands, and delaying his responses.

(*Id.*)  E.R.'s social skills were progressing erratically.  (*Id.*)

For example, E.R. increased the number of his social

interactions, but he was less successful in enhancing his

communication skills.  (*Id.*)  Again, E.R.'s functional deficits

were noted as anxiety, hyperactivity, and short attention span.

(Tr. 264.)

**C. 2006 ADHD Treatment History**

Dr. Millet's January 7, April 7, July 7, and October

7, 2006 treatment plan reviews each noted that E.R. continued to

show steady progress toward reaching his mental health

objectives and overcoming his hyperactivity.  (*See* Tr. 255, 257,

259, 261.)  He also demonstrated slow progress in his ability to

attend to and complete tasks, but the reports explained that

this may have been due to family dynamics and "environmental

---

[5] The term "mental health objectives" refers to Dr. Millet's goals
that she would set for E.R. in each of her quarterly treatment plan reviews.
(*See* Tr. 247-74.)

stressors." (Tr. 259, 261.) E.R. showed slow but steady progress in improving his academic performance. (Tr. 261.) E.R.'s progress in social skills and communication remained the same; i.e., slow but steady progress. (Tr. 255, 257, 259, 261.) E.R.'s physical health was good, however, the reports noted some difficulty in establishing and increasing his physical activity. (*Id.*) E.R.'s functional deficits were noted as anxiety, irritability, short attention span, impulsivity, susceptibility to distraction by external stimuli, and school performance-behavior problems. (Tr. 256, 258, 260, 262.)

### D. 2007 ADHD Treatment History

In the January 7, 2007 treatment plan review, Dr. Millet indicated that E.R. continued to progress toward reaching his mental health objectives. (Tr. 253.) Dr. Millet noted that while he improved his ability to complete tasks, E.R. had inconsistent progress in delaying his responses and considering the consequences of his actions, which was "attributable to resistance related to secondary gains." (*Id.*) E.R. showed steady progress in maintaining his health and in improving his reckless behavior. (*Id.*) However, E.R. was less successful in improving his stress reactions. (*Id.*) E.R.'s social interactions were steadily progressing; however, he was less successful in working on his emotional expressiveness. (*Id.*) E.R.'s functional deficits were listed as hyperactivity, short

attention span, school performance-behavior problems, and irritability. (Tr. 254).

Dr. Millet's April 7, 2007 treatment plan review noted E.R.'s moderate improvement in his school life and limited progress in dealing with bouts of anxiety and irritability. (Tr. 251.) The review noted E.R.'s improvement in completing tasks and reducing stress levels. (*Id.*) E.R. showed slow but steady progress in his social skills. (*Id.*) He was successful in establishing his ability to initiate interactions with others, but less so in developing clear boundaries. (*Id.*) E.R.'s functional deficits were noted as unstable mood, bouts of irritability, and concentration and performance problems at school. (Tr. 252).

In the July 7, 2007 treatment plan review, Dr. Millet again noted E.R.'s steady progress in reaching his mental health objectives. (Tr. 249.) The review noted that E.R. had made moderate improvements in avoiding frequent arguments with adults; however, E.R. had limited progress in following rules and dealing with confrontational behavior, which was largely attributed to "increased environmental stressors." (*Id.*) E.R. was successful in improving academic performance but less so in improving his relationship with his siblings. (*Id.*) His social skills showed steady progress. (*Id.*) E.R.'s functional

deficits were described as short attention span, low school-behavior-performance, and oppositional attitude.  (*Id.* at 250.)

Dr. Millet's October 7, 2007 treatment review plan noted "sustained good progress" and "marked improvement" in separation anxiety and concentration abilities.  (Tr. 247.) E.R. had demonstrated "striking progress" in adjusting to family and school life.  (*Id.*)  E.R. had also increased his ability to socialize.  (*Id.*)  Dr. Millet noted E.R.'s functional deficits as hyperactivity, not listening at times, and problems learning. (*Id.*)

**E. 2008 ADHD Treatment History**

In the January 7, 2008 treatment plan review, Dr. Millet indicated that E.R. continued to make "sustained significant progress" toward reaching his mental health objectives.  (Tr. 369.)  He demonstrated "marked improvement" in his attention and concentration.  (*Id.*)  However, E.R. had slow progress in completing tasks and mastering his judgment of behavioral consequences.  (*Id.*)  E.R. improved his academic performance, but still had trouble with procrastination.  (*Id.*) His social skills were steadily progressing as evidenced through increased social interactions.  (*Id.*)  E.R.'s functional deficits were listed as short attention span, anxiety, and an oppositional attitude.  (Tr. 370.)

On March 15, 2008, Dr. Millet completed a
questionnaire in response to an information request from the New
York State Office of Temporary and Disability Assistance,
Division of Disability Determinations (the "State Agency").[6]
(Tr. 201-07, 278-87).  In the questionnaire, Dr. Millet reported
that E.R. had been diagnosed with ADHD and that his symptoms
were short concentration span, irritability, and oppositional
attitude.  (Tr. 279.)  Concerning E.R.'s mental status, Dr.
Millet noted that E.R. had an appropriate attitude but also
exhibited oppositional yet cooperative behavior.  (Tr. 282.)
She also noted that E.R.'s speech, thought and perception were
fair, and that his mood was euthymic, or normal, and
hyperactive.  (*Id.*)  Further, Dr. Millet noted E.R. had a short
attention span, poor memory, poor ability to perform
mathematical calculations, and poor insight and judgment.  (*Id.*)
Concerning her functional assessment of E.R., Dr. Millet did not
observe any limitations, but she described E.R.'s daily
activities as being limited to going to school, doing homework,
and watching TV.  (Tr. 283.)  Dr. Millet also noted that E.R.
was limited in his social interactions and that he had poor
social skills.  (Tr. 284.)  In addition, Dr. Millet noted that

---

[6] The State Agency is responsible for adjudicating disability
claims on behalf of the federal government under the Act.  (Tr. 278.)

E.R. was limited in his ability to adapt, and that he responds poorly to change. (*Id.*)

Dr. Millet also wrote a letter addressed "To Whom It May Concern"[7] regarding E.R. on that same day. (Tr. 286.) Dr. Millet wrote that E.R. had been diagnosed with ADHD and that since his treatment started in 2004, he had shown good motivation and "slow but positive progress." (*Id.*) Dr. Millet again noted that E.R.'s main symptoms were short attention span, poor concentration, out-of-control behavior, and poor school performance and behavior. (*Id.*) Additionally, Dr. Millet noted that in the beginning of his treatment, E.R. was defecating on himself for almost a year. (*Id.*)

Dr. Millet's April 7, 2008 treatment plan review observed that E.R. was making steady progress in reaching his mental health objectives. (Tr. 367.) Specifically, E.R. had demonstrated "marked improvement" in working through negative perceptions of authority figures. (*Id.*) E.R. had inconsistent progress in working to overcome excessive sensitivity to criticism, some of which was attributable to resistance related to secondary gains. (*Id.*) E.R.'s health was moderately progressing, with noted improvements in nutritional planning, but less improvement in establishing exercise routines. (*Id.*)

---

[7] The administrative record also contains a copy of an envelope addressed to the State Agency immediately after this letter; however, it is not clear that the letter was sent to the State Agency. (Tr. 287.)

E.R. improved his time management skills and reduced his conflicts with authority figures. (*Id.*) E.R. was steadily progressing socially, particularly in overcoming his defensiveness. (*Id.*) E.R.'s functional deficits were listed as unstable mood and bouts of irritability-anxiety. (Tr. 368.)

On April 30, 2008, Mindy Singer, M.A. CCC-SLP ("Ms. Singer"), a speech language pathologist, issued a report at the request of the State Agency after conducting various speech evaluation tests on E.R. (Tr. 300.) Ms. Singer observed that E.R. "presented as a shy quiet child. He demonstrated a fair attention span. He remained cooperative throughout the testing. His responses were . . . thoughtful and deliberate with no evidence of distractibility or inattentiveness." (*Id.*) In the area of receptive language, E.R. had difficulty processing directions and remembering the names, order, and details of objects. (Tr. 302.) In the area of expressive language, Ms. Singer noted that E.R. used simple sentences and that he did not use age appropriate rules for formulating sentences. (*Id.*) In addition, she noted that E.R.'s vocabulary, grammar, and sentence structure were below age level. (*Id.*) On the other hand, Ms. Singer noted that E.R.'s intelligibility was judged above 90%, and that his pragmatic skills, i.e., how well a person communicates and interacts with others, were judged fair. (*Id.*) After administering a Clinical Evaluation of Language

Fundamentals, Fourth Edition ("CELF-4"), Ms. Singer diagnosed E.R. with severe receptive and expressive language delays. (Tr. 301, 303.) As a result, Ms. Singer recommended that E.R. receive speech and language services. (Tr. 303.) Ms. Singer's prognosis was "[f]air with appropriate intervention." (*Id.*)

In May 2008, E.R.'s Adderall dosage was increased from 10 to 15 milligrams. (Tr. 222, 392.)

Also in May 2008, State Agency consultants R. Lopez, a psychologist, and C. Liddie, a speech language pathologist, evaluated E.R. (Tr. 306-11.) They found that E.R.'s impairments, ADHD and speech and language delays, were severe but did not meet, medically equal, or functionally equal a listed disability. (Tr. 306.)

In reviewing E.R.'s ability to acquire and use information, the consultants found that E.R.'s impairment was less than marked. (Tr. 308.) In particular, they noted that although E.R.'s formal testing would indicate that he was severely impaired, it was inconsistent with functional evidence contained in his teacher's report, which noted that E.R. reads and writes at 4th grade level. (*Id.*)

In reviewing E.R.'s ability to attend to and complete tasks, the consultants found E.R.'s impairment was less than marked. (*Id.*) The consultants noted that Dr. Millet and E.R.'s teacher had differing views regarding E.R.'s short attention

span. (*Id.*) Particularly, the consultants noted that, on the one hand, Dr. Millet noted E.R.'s short attention span in this area, while, on the other hand, E.R.'s teacher found no limitation in attending to and completing tasks. (*Id.*) In the area of interacting and relating with others, the consultants found E.R.'s impairments less than marked. (*Id.*) In particular, the consultants found E.R. to be over 90% intelligible and that although his skills were reduced in formal testing, his functional skills had been documented elsewhere in his file, including the fact that E.R. speaks spontaneously, answers questions, and converses with others, as documented in his March 2008 school report, the April 2005 mental status check, and the January 2008 clinical evaluation. (*Id.*) For these reasons, the consultants found that E.R.'s impairments did not meet, medically equal, or functionally equal a listed disability. (Tr. 311).

Dr. Millet's July 7, 2008 treatment plan review noted E.R.'s "sustained significant progress" in reaching his mental health objectives and "marked improvement" in attention and concentration. (Tr. 365.) Dr. Millet also noted that E.R. was effective in reducing poor sleep habits, but less successful in reducing stress reactions. (*Id.*) According to Dr. Millet, E.R. improved his academic performance and showed steady progress in the quality of his social interactions. (*Id.*) E.R.'s

functional deficits were listed as unstable mood, bouts of
irritability, anxiety, and out-of-control behavior. (Tr. 366.)

### F. 2009 Psychiatric Evaluation

On August 6, 2009, Dr. Millet completed a medical
evaluation of E.R.'s psychiatric impairment. (Tr. 396-400.)
Dr. Millet observed in E.R. the following: irritable mood,
agitation (though partially controlled with medication),
feelings of worthlessness, difficulty thinking or concentrating,
easy distractibility, marked inattention, impulsiveness and
hyperactivity, increased talkativeness or pressure of speech,
and activities with "painful consequences" for himself, his
peers and siblings. (Tr. 396-97.) Although the report form
asked for specific examples, Dr. Millet provided none. (*Id.*)

Concerning E.R.'s functional limitations, Dr. Millet
opined that E.R. had marked limitations in all domains except
motor function. (Tr. 398-400). In each domain, Dr. Millet did
not provide examples, descriptions or explanations. (*Id.*)

### V. Summary of E.R.'s School Records

#### A. 2007 IEP

On June 6, 2007, an individualized education program
(IEP)[8] conference was held between plaintiff, E.R.'s general

---

[8] An IEP is a document that "describes the special education and
related services specifically designed to meet the unique educational needs
of a student with a disability." NEW YORK CITY DEP'T OF EDUCATION, Individualized
Education Program (IEP), NYC.GOV (last visited Feb. 28, 2013), *available at*
http://schools.nyc.gov/Offices/District75/Departments/IEP/default.htm.

education teacher, and the school psychologist. (Tr. 289.)
Regarding E.R.'s school performance, the conference report noted
that E.R. participated and interacted well during his speech
therapy. (Tr. 290.) According to his teacher, E.R. got
distracted and frustrated when working independently. (*Id.*)
The teacher noted that E.R.'s biggest weakness was his writing,
that he cannot write for extended periods of time, and his
sentence structure and spelling often did not make sense. (*Id.*)
In addition, E.R. struggled with reading comprehension; however,
his math skills were steadily improving. (*Id.*) As a result,
the IEP found that E.R.'s academic needs were continued speech
and language therapy, which would continue to address his
deficits in receptive and expressive language. (*Id.*)

Regarding E.R.'s social performance, the IEP described
E.R. as attentive in class, and noted that his participation
during discussions demonstrated his understanding. (Tr. 291.)
The IEP noted that E.R.'s behavior was age appropriate, that he
worked well in small groups and that he had "become very social
since the beginning of the year." (*Id.*) The IEP found no
modifications were needed to his academic environment. (*Id.*)

The IEP reported no issues regarding E.R.'s physical
health. (Tr. 292.)

As a result of the 2007 IEP, E.R. received continued speech and language therapy and the criteria for his promotion to the next grade level were modified.  (Tr. 297.)

### B. 2008 Speech-Language Progress Report

On January 15, 2008, Jason Osofsky ("Mr. Osofsky"), E.R.'s speech therapist, completed a speech-language progress report on January 15, 2008.  (Tr. 299.)  Mr. Osofsky would meet with E.R. and two other students twice a week for 30 minutes.  (*Id.*)  Mr. Osofsky noted that E.R. participated and interacted well in their therapy sessions.  (*Id.*)  He also noted that E.R. had made moderate progress in following multi-step directions and in describing pictures and objects with detail.  (*Id.*)  Additionally, Mr. Osofsky noted that there was still room for improvement in retelling stories thoroughly and in identifying spatial relationships.  (*Id.*)

### C. 2008 Teacher Questionnaire

In March 2008, Pauline Tavarez ("Ms. Tavarez"), E.R.'s fourth grade teacher, completed a Teacher Questionnaire for the State Agency concerning E.R.'s overall functioning.  (*See id.* at 115-23.)  Ms. Tavarez reported that she spent seven hours a day and five days a week with E.R. teaching subjects including reading, writing, math, and social studies.  (Tr. 115.)  She noted that E.R.'s primary language is English.  (*Id.*)

According to Ms. Tavarez, E.R. had problems functioning in the area of acquiring and using information. (Tr. 116.) She characterized E.R.'s activities in this area[9] compared to other children as a "slight problem" to "obvious problem."[10] (*Id.*) In all other areas, including attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and caring for oneself, Ms. Tavarez did not observe any problems and noted that E.R.'s functioning appeared age appropriate. (Tr. 117-20.)

In addition, Ms. Tavarez explained that when E.R. began in her class he was reading very far below grade level. (Tr. 116.) At the time she completed the questionnaire, Ms. Tavarez explained that E.R. was approaching 4th grade reading level and was making improvements in his math skills. (*Id.*)

---

[9] The Teacher Questionnaire listed the following activities to assess E.R.'s ability in acquiring and using information: comprehending oral instructions, understanding school and content vocabulary, reading and comprehending written material, comprehending and doing math problems, understanding and participating in class discussions, providing organized oral explanations and adequate descriptions, expressing ideas in written form, learning new material, recalling and applying previously learned material, and applying problem-solving skills in class discussions. (Tr. 116.)

[10] The Teacher Questionnaire asked Ms. Tavarez to rate E.R.'s abilities in certain activities using a scale of 1 through 5. (Tr. 116.) A rating of 1 signified "no problem"; a rating of 2 signified a "slight problem"; a rating of 3 signified an "obvious problem"; a rating of 4 signified a "serious problem"; and a rating of 5 signified a "very serious problem." (*Id.*) Ms. Tavarez used only ratings of 2 and 3 to characterize E.R.'s problems in acquiring and using information. (*Id.*)

**D. 2008 IEP**

On May 21, 2008, a second IEP conference was held to review E.R.'s prior IEP. (Tr. 315.) Concerning his academic performance, the IEP report noted that E.R. "is a very smart and sweet boy who participates and interacts well in therapy" sessions. (*Id.*) E.R. continued to have some difficulty in understanding abstract math concepts. (*Id.*) E.R.'s reading comprehension was improving, he was partially understanding what he read, and his written vocabulary was below grade level. (*Id.*) Although he did not actively participate in discussions, the IEP observed that E.R.'s overall academic performance was approaching grade level. (*Id.*) The IEP recommended that E.R. receive a small classroom setting, and more individual attention, and that he sit closer to the board to avoid distractions. (*Id.*)

The IEP report described E.R.'s social skills as age appropriate. (Tr. 316.) The IEP report noted that E.R. was cooperative, friendly, and that he "works well in small groups and initiates well with other students." (*Id.*) The report did not recommend any changes to E.R.'s social environment. (*Id.*)

The IEP reported no issues regarding E.R.'s physical health. (Tr. 317.)

The 2008 IEP recommended that E.R. continue his educational plan without any changes. (Tr. 314.) E.R. would

continue to receive speech and language therapy while staying in a general education classroom, with the annual goal of improving expressive and receptive language skills. (*Id.;* Tr. 318.)

## VI. Medical Expert Hearing Testimony

At the ALJ hearing on August 25, 2009, Edward Halperin, M.D. ("Dr. Halperin") testified that E.R. did not meet or equal the social security disability listings. (Tr. 47.) Dr. Halperin stated that his opinion was based on the fact that E.R. has been responsive to his medication over the years and is making progress in his language and reading skills, even though E.R. seemed somewhat anxious and depressed. (Tr. 47, 49.) In addition, Dr. Halperin noted that while the formal testing administered by Ms. Singer in April 2008 showed severe difficulties in language, these difficulties did not meet a disability listing. (*Id.*) Particularly, Dr. Halperin noted that Ms. Singer's evaluation observed that E.R. was able to communicate effectively, that he was intelligible, and that his pragmatic skills (i.e., the way in which a person communicates and interacts) were fair. (Tr. 48.) For that reason, Dr. Halperin found E.R. to be much more functional in terms of his language skills than formal testing showed. (*Id.*)

To demonstrate his opinion, Dr. Halperin asked the ALJ to ask E.R. a few additional questions on the record, such as, what grade E.R. was going into, the name of his teacher, whether

he liked the teacher, how many students were in the class, the names of his friends, and what sports he plays in school. (Tr. 44-45.) Dr. Halperin asked the ALJ to ask E.R. questions because, in his opinion, it showed that E.R. is much more functional than his formal testing suggests. (Tr. 49.)

Concerning plaintiff's non-attorney representative's allegations that E.R. defecates on himself, Dr. Halperin had difficulty understanding the basis of the allegation. (*Id.*) First, he explained that Dr. Millet reported no limitation in the domain of caring for oneself. (*Id.*) Second, Dr. Halperin noted that Dr. Millet was not treating E.R. for that condition, nor had she referred him to another doctor.[11] (Tr. 49-50.) Dr. Halperin insisted that E.R. be asked if he had defecated on himself in school, and that if so, there would likely be some notation of this by the school. (Tr. 50.) The ALJ declined the doctor's request. (*Id.*)

Dr. Halperin also testified that, in terms of E.R.'s claimed disability and behavioral issues, he could not find them in E.R.'s school records. (Tr. 47.) In reviewing E.R.'s school records, Dr. Halperin noted that there was no mention of a bi-

---

[11] At the hearing, there was some disagreement about whether Dr. Millet knew about this condition. (Tr. 49-50.) Plaintiff's non-attorney representative claimed that plaintiff testified at the hearing that she had not told Dr. Millet about this issue; however, the hearing transcript does not show any such testimony. (*Id.;* Tr. 30-43.) Dr. Millet's May 2004 evaluation noted that E.R. had reportedly defecated on himself for two months before commencing therapy in 2004. (Tr. 217.)

lingual classroom for E.R. (whose mother speaks only Spanish),
and that no formal psychological examination had been performed
by the school. (*Id.*) Ultimately, Dr. Halperin opined that E.R.
did not meet or equal any disability listing. (*Id.*)

**VII.  The ALJ's October 9, 2009 Opinion**

On October 9, 2009, the ALJ issued an opinion finding
that E.R. was not disabled under the Act. (Tr. 11.) Performing
the three-step analysis set forth in the regulations of the
Social Security Administration Regulations(the "Regulations") at
20 C.F.R. § 416.924, the ALJ first found that E.R. had "not
engaged in substantial gainful activity since January 24, 2008."
(Tr. 14.) Second, the ALJ found that E.R.'s attention deficit
hyperactivity disorder "impairment impose[d] more than minimal
limitations in [his] functional capacity," and that this
impairment was "severe." (*Id.*) Third, however, the ALJ
determined that E.R. did not "have an impairment or combination
of impairments that meets or medically equals one of the listed
impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1" and
that E.R. did "not have an impairment or combination of
impairments that functionally equals the listings" pursuant to
20 C.F.R. §§ 416.924(d) and 416.926a. (Tr. 15.)

In finding that E.R.'s impairments did not meet or
medically equal a listed impairment, the ALJ found that the
"medical evidence of record [did] not document signs, symptoms,

and/or laboratory findings indicating any impairment severe enough to meet the criteria of any listed impairment." (*Id.*) The ALJ further explained that, "[n]o treating, examining, or non-examining medical source has mentioned findings or rendered an opinion that [E.R.'s] impairments, singly or in combination, medically equaled the criteria of any listed impairment." (*Id.*) In addition, the ALJ noted that he gave specific consideration to "section[] 112.11 of the listed impairments," but he did not further elaborate.[12] (*Id.*)

In finding that E.R.'s impairments did not functionally equal any listed impairment, the ALJ evaluated the degree of limitation in the six functional equivalence domains as provided for in 20 C.F.R. §§ 416.924a, 416.926a, and 416.929. (*Id.*; Tr. 22-27.) Specifically, the ALJ considered

> "all of the relevant evidence" includ[ing] objective medical evidence and other relevant evidence from medical sources; information from other sources, such as school teachers, family members, or friends; the claimant's statements (including statements from the claimant's parent(s) or other caregivers); and any other relevant evidence in the case record, including how the claimant functions over time and in all settings (i.e., at home, at school, and in the community).

(Tr. 15.) The ALJ also evaluated the "whole child" pursuant to 20 C.F.R. §§ 416.926a(b) and (c), which is further explained in

---

[12] Section 112.11 describes the required medical findings and impairment-related functional limitations in order to find that a child under the age of eighteen is "disabled" under the Act. 20 C.F.R. Part 404, Subpart P, Appendix 1, § 112.11.

SSR 09-1p, 2009 WL 396031 (Feb. 17, 2009). (*Id.*)  The ALJ explained that he evaluated how E.R. functions at all times compared to children of the same age who do not have impairments.  (*Id.*)  The ALJ further assessed the interactive and cumulative effects of E.R.'s ADHD on his functional limitations.  (*Id.*)  In addition, the ALJ considered the type, extent, and frequency of the help E.R. needs to function.  (*Id.*)

In the domain of acquiring and using information, the ALJ found that E.R. had marked limitation in spite of conflicting evidence.  (Tr. 22.)  For example, E.R. tested two standard deviations below the mean in the CELF-4 administered by Ms. Singer.  (*Id.*)  However, this score conflicted with Ms. Singer's own overall conclusions that E.R. was able to communicate effectively.  (*Id.*)  Evidence from E.R.'s teacher, Ms. Tavarez, that E.R. had no serious problem in the area of acquiring and using information also conflicted with the ALJ's finding of a marked limitation in the acquiring and using information domain.  (*Id.*)  Nevertheless, the ALJ gave the claimant "the benefit of the doubt" and found a marked limitation in the domain of acquiring and using information. (*Id.*)

In the domain of attending and completing tasks, the ALJ found that E.R. had a less than marked limitation in attending and completing tasks.  (Tr. 23.)  The ALJ found that

Ms. Tavarez's assessment was consistent with a finding of no limitations in this area. (*Id.*) However, the ALJ noted that Dr. Millet's observation that E.R. was still performing under grade level and had shown only slow progress in completing tasks at home were indicative of some limitation. (See *id.*) As a result, the ALJ determined regarding attending and completing tasks that "the balance of the record supports the conclusion that [E.R.] continues to experience a limitation that is more than moderate, but less than marked." (*Id.*)

In the domain of interacting and relating with others, the ALJ found that E.R. had a less than marked limitation. (Tr. 24.) The ALJ noted that Ms. Tavarez noted no limitation in this domain. (*Id.*) The ALJ also noted that E.R. did not participate voluntarily in class, and that he had been described as shy and quiet in speech pathology evaluations. (*Id.*) Further, the ALJ noted Dr. Millet's observations that E.R. still experienced communication delays that affected his social functioning. (*Id.*) The ALJ concluded that E.R. had a limitation in this domain, but that it was less than marked. (*Id.*)

In the domain of moving about and manipulating objects, the ALJ found no limitation, noting that there was no evidence to support a finding otherwise. (Tr. 25.)

In the domain of caring for oneself, the ALJ found that E.R. had no limitation. (Tr. 26.) The ALJ explained that

Ms. Tavarez noted no limitation in E.R.'s ability to function in this area. (*Id.*) Regarding plaintiff's assertion that E.R. defecates on himself and therefore has a marked limitation, the ALJ found no support in the record for such an allegation. (*Id.*) Particularly, the ALJ noted that the only reference to this was in Dr. Millet's letter dated March 18, 2008, in which she that E.R. had been defecating on himself for almost a year after treatment began. (*Id.*) The ALJ noted that while plaintiff testified at the hearing that this occurs on a daily basis, the absence of any attempted treatment or mention of the problem outside of Dr. Millet's letter "belies the assertion." (*Id.*)

In the domain of health and physical well-being, the ALJ found no limitation, noting that there was no evidence to support a finding otherwise. (Tr. 27.)

Because the ALJ did not find an impairment or combination of impairments that result in either a "marked" limitation in two domains of functioning, or "extreme" limitations in one domain of functioning, the ALJ determined that E.R. is not disabled as defined under the Act. (*Id.*)

In addition, the ALJ explained that in considering E.R.'s symptoms, he followed a two-step process in which he determined whether there was an underlying medically determinable impairment that could reasonably be expected to

produce the claimant's pain or symptoms. (Tr. 16.) Then, the ALJ evaluated the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities. (*Id.*) For this purpose, the ALJ explained that whenever statements concerning intensity, persistence, or limiting effects of the claimant's symptoms are not substantiated by objective medical evidence, then the ALJ must make a finding of credibility based on the entire case record. (*Id.*)

The ALJ determined that the medical records failed to corroborate plaintiff's assertions and hearing testimony in support of E.R.'s disability claim. (Tr. 20-21.) The ALJ explained that E.R.'s medical treatment had been conservative and that E.R. had not been hospitalized. (Tr. 21.) The ALJ also noted that while E.R. continues to experience delays in expressive and receptive communication, E.R. continues to receive speech pathology treatments, and his speech is fluent and intelligible. (*Id.*) The ALJ found that despite being diagnosed with ADHD, E.R.'s condition had improved and was evidenced by progress in school and by the fact that his teacher noted no serious problems. (*Id.*) In addition, the ALJ noted that Adderall appeared to be effectively aiding E.R. without any adverse side effects. (*Id.*) As the ALJ noted, E.R. engages in a reasonably broad range of daily activities and has friends at

school. (*Id.*) As a result, the ALJ concluded that E.R.'s "longitudinal medical history is not consistent with the allegation of disability" and that the testimony supporting E.R.'s claim was generally not credible. (*Id.*)

The ALJ also explained how he weighed the evidence in the record. (*Id.*) In considering the testimony of the medical expert, Dr. Halperin, the ALJ accorded "significant weight" to his testimony because it was well supported by and consistent with the record as a whole. (*Id.*)

The ALJ also gave "significant weight" to the evidence offered by Ms. Tavarez, E.R.'s teacher, because it too was well supported by the record documenting E.R.'s progress prior to filing his SSI application. (*Id.*) The ALJ further explained his decision was justified because Ms. Tavarez taught E.R. for "seven hours a day, five days a week for an entire academic year and, as such, has had a greater opportunity to observe [E.R.] in a setting requiring intellectual performance and social interaction than any other relevant professional who has offered an opinion." (*Id.* (citing SSR 06-03p, 2006 WL 2329939 (Aug. 9, 2006).)

The ALJ gave "little weight" to the medical source statements offered by Dr. Millet. (Tr. 21.) The ALJ explained that Dr. Millet's opinion concerning the severity of E.R.'s limitation was not well supported and was contradicted by

substantial evidence.  (*Id.*)  The ALJ noted that Dr. Millet's
opinions were inconsistent with "her own findings of
improvement, which she described as 'marked,' 'significant' and
'striking' by the date the application was filed and shortly
thereafter, as well as the findings on mental status
examinations contained in her treatment records."  (*Id.*)  As a
result, the ALJ could not give Dr. Millet's opinion controlling
weight.  (*Id.*)  The ALJ further explained that Dr. Millet's
opinion was entitled to little weight, after considering her
specialty and the length and nature of her treatment
relationship because of the inconsistencies with "the remainder
of the record, which reflects a communication delay but little
else by way of significant limitation resulting from [E.R.'s
ADHD]."  (*Id.*)

The ALJ lastly noted that the conclusions reached by
R. Lopez and C. Liddie, the State Agency consultants, finding
that E.R. had less than marked limitations in three domains and
no limitations in the other domains, were consistent with the
record, but that, their findings did not form the basis of the
ALJ's decision.  (*Id.*)

## DISCUSSION

I. **Standard of Review**

   A. **The Treating Physicians Rule and Weight to be Afforded to Medical Evidence**

"Regardless of its source," the ALJ must evaluate "every medical opinion" in determining whether a claimant is disabled under the Act. 20 C.F.R. §§ 404.1527(d), 416.927(d). Where "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [the ALJ] will give it controlling weight." *Id.* §§ 404.1527(d)(2), 416.927(d)(2). Medically acceptable clinical and laboratory diagnostic techniques may include "[a] patient's report of complaints, or history." *Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003) (alteration in original) (quoting *Flanery v. Chater*, 112 F.3d 346, 350 (8th Cir. 1997)).

Pursuant to the Regulations, a treating source is "your own physician . . . or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. §§ 404.1502, 416.902. The Regulations also provide that the medical opinion of a treating

physician "on the issue(s) of the nature and severity of [the] impairment" will be given controlling weight if that opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." *See Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008); *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (the treating physician rule "requires deference to the medical opinion of a claimant's treating physician."); *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 343 (E.D.N.Y. 2010)); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The opinions of treating physicians are given controlling weight because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations." 20 C.F.R. §§ 404.1527, 416.927.

On the other hand, in situations where "the treating physician issued opinions that [were] not consistent with other substantial evidence in the record, such as the opinion of other medical experts," the treating physician's opinion "is not afforded controlling weight." *Halloran*, 362 F.3d at 32; *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("When other

substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling.  And the less consistent that opinion is with the record as a whole, the less weight it will be given.").  Thus, the ALJ "considers the data that physicians provide but draws [his or her] own conclusions as to whether those data indicate disability."  *Snell*, 177 F.3d at 133.  Nonetheless, an ALJ "cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." *Scott v. Astrue*, No. 09-CV-3999, 2010 WL 2736879, at *9 (E.D.N.Y. July 9, 2010) (citing *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999)); *see also Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] *sua sponte*.").

When controlling weight is not given to a treating physician's opinion, the Regulations require the ALJ to "comprehensively set forth reasons for the weight assigned to a treating physician's opinion."  *Halloran*, 362 F.3d at 33; *see also Snell*, 177 F.3d at 133; *Jeffcoat v. Astrue*, No. 09-CV-5276, 2010 WL 3154344, at *14 (E.D.N.Y. Aug. 6, 2010); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (the Social Security Administration "will *always give good reasons* in [its] notice of determination or decision for the weight [given to a] treating

source's opinion") (emphasis added). Courts have not "hesitate[d] to remand [cases] when the Commissioner has not provided 'good reasons' for the weight given to a treating physicians [sic] opinion." *Halloran*, 362 F.3d at 33. Additionally, the court should "continue remanding when [it] encounter[s] opinions from ALJ's [sic] that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." *Id.*

The Regulations set forth the following five factors that ALJs must apply to determine how much weight should be given to a treating physician's opinion:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

*Halloran,* 362 F.3d at 32; *see also Scott*, 2010 WL 2736879, at *17; 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6).

**B. The ALJ's Duty to Develop the Record**

The duty of an ALJ to develop the administrative record is a bedrock principle of Social Security law. *Rodriguez ex rel. Silverio v. Barnhart*, No. 02-CV-5728, 2003 WL 22709204, at *3 (E.D.N.Y Nov. 7, 2003). This duty exists when there is a

deficiency in the record even where a claimant is represented by counsel. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999); *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996). "The obligation to develop the record includes assembling the claimant's complete medical history and recontacting the claimant's treating physician if the information received from the treating physician or other medical source is inadequate to determine whether the claimant is disabled." *Rodriguez ex rel. Silverio*, 2003 WL 22709204, at *3; *see also Rosa*, 168 F.3d at 80(finding that medical records consisting of sparse notes from nine visits required the ALJ to request additional information in order to have an exhaustive record on which to base the ALJ's conclusions, which would represent claimant's condition over the whole period).

## C. The Substantial Evidence Standard

A district court reviews the Commissioner's decision to "determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart,* 388 F.3d 377, 384 (2d Cir. 2004) (citing *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002)). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran*, 362 F.3d at 31 (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)).

After reviewing the Commissioner's determination, the district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." *Butts*, 388 F.3d at 384 (quoting 42 U.S.C. § 405(g)). "Remand is 'appropriate where, due to inconsistencies in the medical evidence and/or significant gaps in the record, further findings would . . . plainly help to assure the proper disposition of [a] claim.'" *Lackner v. Astrue*, No. 09-CV-895, 2011 WL 2470496, at *7 (N.D.N.Y. May 26, 2011) (quoting *Kirkland v. Astrue*, No. 06-CV-4861, 2008 WL 267429, at *8 (E.D.N.Y. Jan. 29, 2008)).

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). "It is the function of the Secretary, not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses." *Aponte v. Sec'y of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (alteration in original) (quoting *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)). A district court "may not substitute its own judgment for that of the Secretary, even if it might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (quoting *Valente v.*

*Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984)).

## II.  Application

### A. The ALJ Properly Applied the Treating Physician Rule

Plaintiff contends that the ALJ did not correctly weigh the opinion of Dr. Millet, E.R.'s treating psychiatrist, and that Dr. Millet's opinion should have been given "controlling weight." (*See* Pl. Mem. at 18-20.)  Plaintiff points to two reports containing Dr. Millet's medical opinions, namely, the March 18, 2008 State Agency report, and her more recent report dated August 6, 2009, which should have been given controlling weight. (*Id.*)  However, plaintiff's argument is meritless because the ALJ properly concluded that Dr. Millet's opinions lacked sufficient support and were contradicted by substantial evidence in the record, including Dr. Millet's own records.

The ALJ declined to afford controlling weight to Dr. Millet's functional assessments of E.R., finding that they were contradicted by substantial evidence in the record.  (Tr. 21.) The ALJ found that Dr. Millet's opinions of E.R.'s functional limitations in the State Agency questionnaire dated March 18, 2008 and the medical evaluation report dated August 6, 2009 were inconsistent with E.R.'s school records, including Ms. Tavarez's questionnaire and E.R.'s IEP reports.  (Tr. 18-20).

Specifically, the ALJ noted that the educational records stood in "stark contrast" to Dr. Millet's opinions in that "Ms. Tavarez reported no limitations in attending to and completing tasks, interacting and relating with others, moving about and manipulating objects, and caring for himself." (Tr. 18-19.) The ALJ further found that Ms. Tavarez's conclusions were supported by E.R.'s school records, which indicated that E.R. is in general education classes with additional speech and language services. (*Id.*) In addition, the ALJ found that Dr. Millet's opinion that E.R. was disabled was "inconsistent with her own findings of improvement, which she described as 'marked,' 'significant' and 'striking'" by the time plaintiff's SSI application was filed. (Tr. 21.)

As the ALJ explained, Dr. Millet's opinions were "inconsistent with and not supported by the remainder of the record, which reflects a communication delay, but little else by way of significant limitation resulting from [E.R.'s ADHD]." (Tr. 21.) For example, the medical expert, Dr. Halperin, testified that E.R. did not meet or equal any listed impairment. (Tr. 47.) In his testimony, Dr. Halperin found that E.R. was much more functional than formal testing suggests. (Tr. 48.) He explained that Ms. Singer's evaluation shows E.R.'s ability to effectively communicate, which Dr. Halperin confirmed at the hearing by asking E.R. a series of questions. (*Id.; see also*

43

Tr. 44-45.) Further, Dr. Halperin testified that the school records failed to disclose any evidence of disability or behavioral issues. (Tr. 47.)

Thus, because Dr. Millet's opinions were inconsistent with her own findings of functional improvement and "not consistent with other substantial evidence in the record", including the opinions of the medical expert, the observations of E.R.'s school teacher Ms. Tavarez, and E.R.'s education records, the ALJ appropriately refused to afford controlling weight to Dr. Millet's opinion that E.R. was disabled.[13] *See Halloran*, 362 F.3d at 32; *Snell*, 177 F.3d at 133; *see also Michels v. Astrue*, 297 Fed. App'x 74, 75-76 (2d Cir. 2008) (upholding ALJ's decision to discount treating physician's opinion due to internal inconsistencies submitted by that treating physician). Furthermore, given the ALJ's justifications for the weight accorded to the evidence in the record, the court concludes that the ALJ complied with his duty

_____

[13] Plaintiff argues that the ALJ should have accorded more than "little weight" to Dr. Millet's opinion. (*See* Pl. Reply at 3-5.) Plaintiff contends that there is a middle ground between "controlling weight" and "little weight" and that the ALJ's decision ignores this reality. (*Id.*) The court disagrees. The ALJ considered the factors required by the Regulations set forth in 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6). The ALJ then made specific reference to Dr. Millet's specialty as well as the length and nature of her treatment relationship with E.R. (Tr. 21.) In spite of those factors, the ALJ concluded that Dr. Millet's opinion was inconsistent with and not well supported by the record, which reflects a communication delay. (*Id.*) Thus, there is no merit to plaintiff's argument because the less consistent an opinion is with the record as a whole, the less weight it is afforded. *Snell*, 177 F.3d at 133.

to "comprehensively set forth reasons" for his decision not to give controlling weight to the treating physician's opinion.[14] *Halloran*, 362 F.3d at 33; *see also* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

## B. The ALJ Adequately Developed the Administrative Record

Plaintiff contends that the ALJ failed to adequately develop the record because there was a fifteen-month gap in the medical records from July 7, 2008 through October 9, 2009 (the date of the ALJ's opinion.) (Pl. Reply at 2-3.) Plaintiff's argument is without merit because the ALJ developed a record of medical and non-medical evidence sufficient to determine whether E.R. was disabled. *See Miller v. Comm'r of Social Sec.*, 409 Fed. App'x 384, 387-88 (2d Cir. 2010) (finding an adequately developed record that included "various medical and educational reports bearing upon [plaintiff's] learning disability and ADHD, including the results of a triennial psycho-educational re-

---

[14] Plaintiff contends that the court may not accept the Commissioner's "*post hoc* rationalizations" of the ALJ's decision to accord "little weight" to Dr. Millet's opinions, and that if the agency action is to be upheld, it must be on the "same basis as that articulated by the agency at the administrative level." (*See* Pl. Reply at 5-6.) The court's conclusion that the ALJ properly weighed the evidence and that he adequately set forth his reasons for doing so are not based on the Commissioner's *post hoc* rationalizations. First, the weight afforded to Ms. Tavarez's opinion was justified by the ALJ based on his finding that she "had a greater opportunity to observe the claimant in a setting requiring intellectual performance and social interaction than any other relevant professional who has offered an opinion." (Tr. 21.) Although the Commissioner points to this very section, the words are the ALJ's. (*See id.*; Def. Reply at 4-5.) Second, the ALJ further stated that Dr. Millet's opinion was entitled to little weight because it was "inconsistent with and not supported by the remainder of the record." (Tr. 21.) Thus, the ALJ incorporated by reference his review of the entire record of evidence.

examination by a school psychologist and a follow-up evaluation by a developmental-behavioral pediatrician who treated Miller's ADHD and learning disability).  In addition, plaintiff fails to "describe with particularity what aspects of the administrative record are lacking."  *Id.*  Here, the record contains various medical reports from a period of over three years, as well as various educational reports, therapists reports, and formal and informal testing results.  *Cf. Rosa*, 168 F.3d at 79-80 (finding ALJ had duty to supplement record containing only "sparse notes" and a short "wholly conclusory" assessment).  The ALJ also questioned both the plaintiff and E.R. regarding E.R.'s condition, treatment, effectiveness of treatment and accommodations that the school has provided.  The record also includes the testimony of an independent medical expert who reviewed the entirety of the record.

Plaintiff cites *Pratts v. Chater*, 94 F.3d 34, 38-39 (2d Cir. 1996) for the proposition that a fifteen month gap in the medical record alone justifies remand.  (*See* Pl. Reply at 3.)  That case, however, is distinguishable.  In *Pratts*, the ALJ was faulted for failing to develop the record because the record was missing thirteen months of treatment notes, "lab results for blood tests and other prescribed tests, identification of some medications, and treatment notes from his social worker."  *Pratts*, 94 F.3d at 38.  In addition, the *Pratts* court also found

that the medical records that were in the record were incomplete

or illegible and "provide[d] no coherent overview of [the

claimant's] treatment." *Id.* Here, the record contains E.R.'s

complete medical record, including various reports that were

missing from the record in *Pratts*, from the date of the alleged

onset of his disability through, and beyond, the date E.R.'s SSI

application was filed. As a result, the court concludes that

the fifteen month gap in treatment records did not render E.R.'s

medical history incomplete, nor did it prevent the ALJ from

making an objective disability determination. *See Lowry v.

Astrue*, 474 Fed. App'x 801, 804 (2d Cir. 2012) (finding that the

ALJ satisfied his duty by developing a record consisting of

extensive treatment records, which was sufficient for the ALJ to

objectively determine that the claimant was not disabled).

Based on the above, the court is "satisfied that the

ALJ adequately developed the record relating to [E.R.'s] mental

impairments and ADHD." *Miller*, 409 Fed. App'x at 387-88.

## C. Substantial Evidence Supports the ALJ's Findings that E.R. Is Not Disabled

At the outset, the court notes that plaintiff does not

challenge the ALJ's findings that E.R.'s ADHD did not meet or

medically equal a listed impairment, or that E.R. had less than

marked limitations in the domains of moving about and

manipulating objects, caring for himself, and health and

physical well-being. (*See* Pl. Mem. 17-24.) Plaintiff contends,
however, that substantial evidence shows that E.R. experiences
marked limitations in both the domains of interacting with
others and attending and completing tasks. (Pl. Mem. 20-24.)
Plaintiff's contentions are misguided. A reviewing court does
not engage in a *de novo* review of the administrative record to
see if an alternative finding could have been possible. *See*
*Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 2009). Rather, the
court must determine whether substantial evidence supports the
ALJ's decisions. *See Jones ex rel. T.J. v. Astrue*, 2010 WL
1049283, at *4. "Substantial evidence" is relevant evidence
which a reasonable mind might accept as adequate to support a
conclusion. *Halloran*, 362 F.3d at 31 (2d Cir. 2004) (internal
quotations and citations omitted).

> **1. Substantial Evidence Supports the ALJ's Findings**
> **Of Less Than Marked Limitation in the Domain of**
> **Attending and Completing Tasks**

In this domain, the ALJ determined that E.R.
"continues to experience a limitation that is more than
moderate, but less than marked." (Tr. 23.) "This domain
measures how well the child is able to focus and maintain
attention, and how well he begins, carries through and finishes
activities, including the pace at which he performs activities
and the ease with which he changes them." *Jones ex rel T.J.*,
2010 WL 1049283, at *9 (citing 20 C.F.R. § 416.926a(h)). In

determining that E.R.'s limitation was less than marked, the ALJ noted that although E.R. was still approaching grade level in his academic performance, Ms. Tavarez noted no limitations in this domain. (Tr. 23.) On the other hand, as the ALJ observed, Dr. Millet noted that the "claimant demonstrated slow progress in the ability to consider consequences of his actions and completing *tasks at home*." (*Id.* (emphasis added)) Because Dr. Millet's testimony was at odds with substantial additional evidence in the record, the ALJ found that "the balance of the record" supported the conclusion that E.R.'s limitation was less than marked.

When the record allows a court to "glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient" in reaching a conclusion regarding a claimant's disability. *Miller*, 409 Fed. App'x at 388 (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (per curiam)). In addition to the evidence specifically cited to by the ALJ, the court finds there is substantial evidence to support the ALJ's conclusion. Notably, E.R. has been in a regular education class and has never been left back a grade in school. (Tr. 31–32.) Further, Ms. Singer, the speech language pathologist that examined E.R.

at the request of the State Agency, also noted that E.R. showed no signs of distractibility or inattentiveness. (Tr. 300.)

While the most recent IEP stated that E.R. needs a smaller classroom and more individualized attention, and would benefit from sitting in the front of the classroom, E.R.'s academic performance is progressing and he is approaching grade level. (Tr. 315.) What is more is that E.R. has accomplished this progress even though no one helps him with his homework at home. (*See* Tr. 40.) Thus, the court is satisfied that there is substantial evidence supporting the ALJ's conclusion that E.R.'s limitation is more than moderate but less than marked in the domain of attending and completing tasks.

### 2. Substantial Evidence Supports the ALJ's Findings Of Less Than Marked Limitation in the Domain of Interacting and Relating With Others

In this domain, the ALJ determined that E.R.'s limitation was less than marked. (Tr. 24.) "This domain measures how well the child initiates and sustains emotional connections with others, develops and uses the language of his community, cooperates with others, complies with rules, responds to criticism, and respects and takes care of the possessions of others." *Jones ex rel. T.J.*, 2010 WL 1049283, at *9 (citing 20 C.F.R. § 416.926a(i)). In making his finding, the ALJ noted that that while Ms. Tavarez noted no limitations in this area, she also indicated that E.R. does not participate voluntarily in

class.  (Tr. 24.)  The ALJ also noted that Ms. Singer described E.R. as quiet and shy during her evaluation.  (*Id.*)  In addition, the ALJ noted Dr. Millet's observations that E.R.'s communication delay affects his social functioning.  (*Id.*)

The court is satisfied that there is substantial evidence in the record, in addition to that specifically cited to by the ALJ, which supports the conclusion that E.R.'s limitation is less than marked.  Notably, E.R. testified that he plays sports at school and has friends.  (Tr. 45.)  Although plaintiff testified that E.R. has behavioral issues at school (i.e., the school allegedly calls plaintiff three to four times a week concerning E.R.'s behavior (Tr. 40.)), the school records fail to confirm plaintiff's testimony, as noted by Dr. Halperin. (Tr. 35, 46.)  Additionally, E.R.'s speech therapist at school noted that E.R. participated and interacted well during therapy sessions, which were conducted with two other students.  (Tr. 299.)  Finally, Dr. Millet's own observations support the ALJ's finding that E.R.'s limitation is less than marked in the domain of interacting with others.  For example, as the ALJ noted, Dr. Millet noted a marked increase in E.R.'s ability to socialize with others in her evaluations through July 7, 2008.  (Tr. 17, 255-367.)  For these reasons, the court is satisfied that substantial evidence supports the ALJ's determination that

E.R.'s limitation in the domain of interacting and relating with others is less than marked.

## CONCLUSION

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is granted and plaintiff's cross-motion for judgment on the pleadings is denied.  The Clerk of Court is respectfully requested to close the case and enter judgment in favor of the Commissioner.

**SO ORDERED.**

Dated: March 25, 2013
      Brooklyn, New York

_____/s/_____<br>
KIYO A. MATSUMOTO<br>
United States District Judge<br>
Eastern District of New York